IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2020

**IN RE BRAYDEN E. ET AL.**

**Appeal from the Juvenile Court for Franklin County**
**No. 2019-JV-97      Thomas C. Faris, Judge**

—————————————————————

**No. M2020-00622-COA-R3-PT**

—————————————————————

The father of two children appeals the termination of his parental rights, contending the petitioner failed to prove a ground for termination or that termination was in the children's best interests by clear and convincing evidence. In 2018, the juvenile court placed the children in foster care and declared them dependent and neglected upon the petition of the Department of Children's Services. The court then ratified a permanency plan that had several requirements for the father, including submitting to and passing random drug screens, resolving pending legal issues, and avoiding new criminal charges. Over the next two years, the father only completed some of the action steps and incurred new criminal charges for which he was incarcerated. In September 2019, the Department filed a petition to terminate the father's rights on the grounds of abandonment by exhibiting a wanton disregard for the children's welfare and by failure to visit, failure to comply with the permanency plan, and failure to manifest an ability and willingness to assume custody of and financial responsibility for the children. After the final hearing, the court found that the Department proved all four grounds and that termination was in the children's best interests. This appeal followed. Following a detailed review of the record, we affirm the trial court's findings in all respects and affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN and JOHN W. MCCLARTY, JJ., joined.

Glen A. Isbell, Winchester, Tennessee, for the appellant, Keith E.[1]

—————————————

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, Nashville, Tennessee, for the appellee, Department of Children's Services.

# OPINION

## FACTS AND PROCEDURAL BACKGROUND

### I. DEPENDENCY AND NEGLECT PROCEEDINGS

Braydon and Harlee E. ("the Children") were born in July 2010 and January 2012, respectively, to Keith E. ("Father") and Amber B. ("Mother").[2] In or around October 2017, Father filed for and received temporary custody of the Children after Mother was incarcerated. The next month, Father was incarcerated for violating the Motor Vehicle Habitual Offender's Act and driving on a revoked license for the fourth time. Around the same time, Father received medical treatment for a condition related to his kidneys.

In December 2017, the juvenile court found probable cause that the Children were dependent and neglected in Father's custody due to Father's medical issues and pending criminal charges. Consequently, the court gave temporary custody of the Children to their paternal grandparents, at whose home the Children were already staying. The placement, however, was short-lived; in January 2018, the grandparents decided that they could no longer care for the Children. After a hearing, the court made a second finding of probable cause for dependency and neglect as to Father and granted custody of the Children to the Tennessee Department of Children's Services ("DCS"). After Father failed to appear at an adjudicatory hearing in March 2018, the court declared the Children dependent and neglected.

Around the same time, DCS social worker, Jeff Bowling, contacted Father to develop a permanency plan for the Children. Father, however, said that he was in Florida for work and could not attend the family team meeting. DCS developed a permanency plan in February 2018 that included several responsibilities for Father: (1) sign an information release; (2) provide an appropriate home for the Children; (3) provide a source of legal income to support the Children; (4) complete an alcohol and drug assessment and follow any recommendations; (5) complete a mental health evaluation and follow any recommendations; (6) submit to and pass random drug screens; and (7) resolve all current/pending legal issues and avoid new criminal charges.[3]

---

[2] Mother's rights were also terminated in this action. She has not appealed that decision and is not a party to this appeal.

[3] DCS developed four permanency plans; each had the same requirements.

Mr. Bowling did not hear from Father again until he showed up for a review hearing in August 2018, at which time Mr. Bowling gave Father a copy of the permanency plan and conducted Father's first drug screen, which tested positive for methamphetamine, MDMA, and THC. At the conclusion of the review hearing, the court ordered that custody of the Children remain with DCS.

In early September 2018, Father completed a "universal" assessment at a mental health clinic. The assessment report recommended that Father attend outpatient therapy for substance abuse.

In the interim, Father was indicted in May of 2018 for the felony offense of Failure to Appear in court to answer pending criminal charges of Violation of Habitual Offender Order, a Class E Felony offense. He was arrested on September 13, 2018, and remained incarcerated. Then, on January 9, 2019, Father pled guilty to the felony offense and was sentenced to serve two years with jail credit from September 13, 2018, the date of his arrest, to January 9, 2019, the date he entered the guilty plea. While incarcerated, Father attended and completed a 12-week "Substance Use Group."[4]

Father was released on probation in March 2019. Thereafter, Mr. Bowling administered three or four random drug screens and visited Father's home twice. Father passed the drug screens, and Mr. Bowling found the home suitable for the Children. But in August 2019, Father was arrested for driving on a suspended license and spent eight days in jail.

Later in August 2019, Father filed a motion for visitation with the Children. The juvenile court denied Father's motion for visitation and ordered custody to remain with DCS based, in part, on Father's lack of progress in complying with the plan.

## II. TERMINATION PROCEEDINGS

DCS filed its petition to terminate Father's parental rights in September 2019. DCS asserted four grounds for termination: (1) abandonment by exhibiting a wanton disregard for the Children's welfare; (2) abandonment by failing to visit; (3) substantial noncompliance with the permanency plan; and (4) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children.

While the petition was pending, Father was arrested for violating the terms of his probation by not reporting to his probation officer and sentenced to 45 days in jail.

Father was still incarcerated in March 2020 when the juvenile court held its final hearing on DCS's petition. The court heard testimony from Father, Mr. Bowling, and the

---

[4] Father has an extensive criminal history which will be addressed in more detail in our analysis.

Children's in-home worker, Alexandria Barnett. The trial court found that DCS proved the alleged termination grounds, and it concluded that termination was in the Children's best interests. Accordingly, the court terminated Father's parental rights and awarded full guardianship to DCS. This appeal followed.

## ISSUES

Father raises two issues on appeal:

I.  Whether the trial court erred by ruling that DCS proved grounds for termination by clear and convincing evidence.

II.  Whether the trial court erred by ruling that DCS proved termination was in the Children's best interest by clear and convincing evidence.

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, . . . eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence," and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *Id*.

## ANALYSIS

### I. GROUNDS FOR TERMINATION

#### A. Abandonment by Exhibiting Wanton Disregard for the Children's Welfare

Father contends the evidence did not clearly and convincingly show that he abandoned the Children by exhibiting a wanton disregard for their welfare. Father concedes

that he has a criminal record but asserts there was insufficient proof that he had a history of drug abuse. DCS counters that Father's extensive criminal history showed a "broad pattern of conduct rendering him unable to care for the children." We agree.

Tennessee Code Annotated § 36-1-113(g) provides that initiation of termination of parental rights proceedings may be based upon "[a]bandonment by the parent or guardian." *Id*. § 113(g)(1). For parents who were "incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action," abandonment includes engaging "in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id.* § 36-1-102(1)(A)(iv), (1)(A)(iv)(c). It is undisputed that Father was incarcerated during part of the four months immediately preceding DCS's filing of this action.

Conduct that exhibits a wanton disregard for the welfare of a child includes "probation violations, repeated incarceration, criminal behavior, substance abuse, and failing to provide adequate support or supervision for a child." *In re Audrey S.*, 182 S.W.3d 838, 867–68 (Tenn. Ct. App. 2005) (citations omitted). This court explained the reasoning behind this ground:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties . . . . Thus, the parent's incarceration serves . . . as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*Id.* at 866 (footnotes omitted). Importantly, evidence relevant to this ground is not limited to the period immediately before the parent's incarceration. *Id*. at 871.

Because Father was incarcerated during part of the four months immediately preceding DCS's filing of the action, we proceed "to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *See id.* at 866.

Father admits to a long history of criminal activity that did not cease when the Children were born in 2010 and 2012. Father was declared a Motor Vehicle Habitual Offender at some point prior to September 27, 2012, when Father was convicted of a

violation of the Class E Felony offense and received a three-and-a-half-year sentence.[5] In November 2017, Father was incarcerated for his fourth charge of driving on a suspended license and a second violation of the Habitual Offenders Act. Then, in April 2018, Father failed to appear at a court hearing on these charges.

In May 2018, Father was indicted for failing to appear in court in April 2018. He was incarcerated on that charge in September 2018, and he pleaded guilty in January 2019. Father remained incarcerated until March 2019. Then, in August 2019, Father pleaded guilty to a second offense of driving on a revoked license and served eight days in jail. In February 2020, shortly before the trial of this matter, Father returned to jail after violating his probation requirements, and he remained in jail through the trial of this case.

The foregoing notwithstanding, Father argues that DCS failed to prove this ground because there was insufficient evidence that he had a history of drug abuse. DCS was not, however, required to prove a history of substance abuse to establish that Father's conduct exhibited a wanton disregard for the Children's welfare.

Having reviewed the record, we agree with the trial court's determination that Father's August 2019 incarceration was "part of a broader pattern of conduct that renders [him] unfit or poses a risk of substantial harm to the welfare of the child." *See id*. Accordingly, we affirm the court's conclusion that DCS proved this ground for termination.

---

[5] Prior to November 13, 2019, the Motor Vehicle Habitual Offenders Act and, specifically, Tenn. Code Ann. § 55-10-616, provided:

> (a) It is unlawful for any person to operate any motor vehicle in this state while the judgment or order of the court prohibiting the operation remains in effect.

> (b) Any person found to be an habitual offender under this part who thereafter is convicted of operating a motor vehicle in this state while the judgment or order of the court prohibiting such operation is in effect commits a Class E felony.

Tennessee Code Annotated §§ 55-10-602 to -618 were repealed by 2019 Pub. Acts, c. 486, § 3, effective November 13, 2019. Pursuant to the now repealed act, a person could be declared a Habitual Offender when, *inter alia*, during a three-year period, the person was convicted in Tennessee of three or more motor vehicle offenses including vehicular homicide, voluntary or involuntary manslaughter resulting from the operation of a motor vehicle, vehicular assault, and driving under the influence. *See* Tenn. Code Ann. § 55-10-602 (2013).

B.  Abandonment by Failing to Visit

The trial court also found that DCS proved abandonment for failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and §§ 36-1-102(1)(A)(i), -102(1)(C) and -102(1)(E). Father contends the evidence did not clearly and convincingly establish this ground.

The last time Father saw the Children was in January 2018. Father states that he attempted to call the Children but was not permitted to do so pursuant to a no-contact order that was issued in November 2018; however, Father did not challenge the no-contact order until August 2019, when he filed a motion for visitation. That motion was denied in September 2019, based on Father's continued noncompliance with the permanency plan.[6]

Moreover, between January 2018—when the Children entered DCS custody—and the entry of the November 2018 no-contact order, Father made no attempt to contact the Children. Simply put, Father disappeared for months at a time. After Mr. Bowling spoke with Father in February 2018—at which time Father claimed to be working in Florida— DCS did not hear back from him until the court hearing in August 2018.

We also note that Father's frequent incarcerations did not prevent him from contacting the Children. Father was out of jail for a total of fourteen months throughout the case, up until his incarceration in February 2020. During this time, his only attempt to have contact with the Children was the filing of the motion for visitation in August 2019.

Accordingly, we affirm the court's conclusion that DCS proved this ground for termination.

C.  Substantial Noncompliance with Permanency Plan

Father contends he was not in substantial noncompliance with the permanency plan because he completed parenting classes, completed an alcohol and drug assessment, attended a recovery program, established a suitable home, had a long history of employment, and passed all but one of the drug screens.

The initiation of termination proceedings may also be based upon "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). This ground may apply so long as "the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement." *Id*. § 37-2-403(a)(2)(C).

---

[6] In the interim, pursuant to a May 22, 2019 order, the court continued the no-contact order "due to the history of the case" and its finding that there had "been little progress."

"Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

The permanency plan required Father to, *inter alia*, "resolve all current/pending legal issues and avoid any new criminal charges." Father did not resolve his pending legal issues and incurred additional criminal charges. This is significant because Father's criminal activity was a crucial factor in the Children's removal. Accordingly, we agree that the evidence clearly and convincingly showed that Father's noncompliance was substantial.

### D. Failure to Manifest Ability and Willingness to Assume Custody

Father contends that he manifested a willingness to assume custody of the Children by seeking temporary custody in 2017 and requesting visitation in 2019. Father asserts that he demonstrated an ability to assume custody and financial responsibility for the Children by maintaining employment and establishing stable housing.

Under Tenn. Code Ann. § 36-1-113(g)(14), a petitioner must prove (1) the parent "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child;" and (2) "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." There has been disagreement as to whether this ground requires DCS to prove either or both a failure to manifest an ability and willingness. *See, e.g.*, *In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, *16 (Tenn. Ct. App. Mar. 4, 2020), *appeal granted* (June 15, 2020). The difference is immaterial to this case because the evidence clearly and convincingly shows that Father failed to manifest both an ability and a willingness to assume custody of the Children.

The termination hearing was held more than two years after the Children were removed and placed into foster care. For the first six months, Father inexplicably made no attempt to remedy the circumstances leading to their removal, i.e., his pending charges. To the contrary, Father compounded his problems by failing to show up for a court hearing, which resulted in Father spending the next six months incarcerated. Then he was released on probation, only to be incarcerated again for driving on a revoked license. He then ignored the terms of his probation and, as a result, was incarcerated again—and he remained in jail during the final hearing. At trial, Father admitted that he repeatedly and willfully violated the law despite knowing that doing so could compromise his ability to care for the Children.

As stated, Father's willful disregard for authority frequently put him in a position where he was unable to care for the Children. Moreover, by manifesting an unwillingness to change his conduct, Father failed to manifest a willingness to assume custody of the Children. Naturally, placing the Children with a parent who has not shown the ability and willingness to abide by the law would put them at substantial risk for harm.

## II. BEST INTERESTS ANALYSIS

Having found the existence of at least one ground for terminating Father's parental rights, we must consider whether DCS presented "clear and convincing evidence that terminating the parent's rights [was] in the best interests of the [Children]." *In re Bernard T.*, 319 S.W.3d 586, 606 (Tenn. 2010); Tenn. Code Ann. § 36-1-113(c). While the combined weight of the evidence must meet the clear and convincing standard, the underlying facts need to be proven by only a preponderance of the evidence. *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878 (citations omitted).

The best-interest analysis "is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i)." *In re Bernard T.*, 319 S.W.3d at 606. "The relevancy and weight to be given each factor depends on the unique facts of each case." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id*.

Tennessee Code Annotated § 36-1-113(i) includes nine factors for courts to consider "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child," four of which particularly apply to this case:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

.   .   .

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child; [and]

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.]

Based on these factors, we agree with the trial court's conclusion that termination is in the Children's best interest.

Father had over two years to adjust the conduct that warranted the Children's placement in foster care. He did not do so. Meanwhile, he has not seen or otherwise had contact with the Children since January 2018. Although Father was not allowed to have contact for a period, "the reasons for the lack of interaction matter little" for the purposes of the best-interest analysis. *White*, 171 S.W.3d at 194. What matters is whether the child feels a connection with the parent. *See id*. The Children's in-home social worker, Ms. Barnett, testified that the Children no longer talk about Father. Ms. Barnett also testified that the Children are in a stable environment and their medical and psychological needs are being met.

Based on the foregoing, we find the evidence does not preponderate against the trial court's findings, which establish clear and convincing evidence that termination is in the Children's best interests.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Keith E, for which execution may issue.

_____
FRANK G. CLEMENT JR., P.J., M.S.